**FORM TO BE USED** ~~BY~~ **A PRISONER IN FILING A CIVIL RIGHTS COMPLAINT**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_18442-056_
**(Inmate Number)**

_Lent Christopher Carr, II_
**(Name of Plaintiff)**

_F.C.I. Schuylkill, Post Office Box 759_
**(Address of Plaintiff)**

_Minersville, PA. 17954-0759_

**vs.**

_Northeast Regional Office (Federal Bureau Of Prisons), et al._

**(Names of Defendants)**

**3 : CV   03 0973**

**(Case Number)**

**COMPLAINT**

FILED
SCRANTON

JUN 11 2003

PER _____ DEPUTY CLERK

**TO BE FILED UNDER:** _____ **42 U.S.C. § 1983 - STATE OFFICIALS**

✓ **28 U.S.C. § 1331 - FEDERAL OFFICIALS**

## I.   Previous Lawsuits

A.   If you have filed any other lawsuits in federal court while a prisoner please list the caption and case number including year, as well as the name of the judicial officer to whom it was assigned:

_City of Greenville, et al, Case No.: 5:01-CT-338-H, May 3, 2001, Sat Below: The Honorable Malcolm J. Howard, Jr., U.S. District Judge For The Eastern District Of North Carolina._

## II.   Exhaustion of Administrative Remedies

A.   Is there a grievance procedure available at your institution?
✓ Yes _____ No

B.   Have you filed a grievance concerning the facts relating to this complaint?
✓ Yes _____ No

If your answer is no, explain why not _____ _N/A_ _____

C.   Is the grievance process completed? ✓ Yes _____ No

III. Defendants

(In Item A below, place the full name of the defendant in the first blank, his/her official position in the second blank, and his/her place of employment in the third blank. Use Item B for the names, positions and places of employment of any additional defendants.)

A. Defendant _Northeast Regional Office, (Federal Bureau of Prisons)_ is employed

as _Extention of the (BOP)_ at _Same as above_

B. Additional defendants _M.E. Ray, (Regional Director) Northeast Regional Office; F.C.I._
_Allenwood, (Ext. BOP); Michael Zenk, (Allenwoods Warden); F.C.I. Schuylkill,(Ext.(BOP));_
_John Nash,(Schuylkills Warden); Lt. Womeldorf, (Allenwood's Lt.); Lt. Lyons,(Allenwood's Lt.);_
_Lt. Litchard,(Schulkill SRO); Lt. Kovauch, (Schuylkills Lt.); Mr. Stines,(Schuylkill's Asst. Warden);_
_D. Sweets, (Schuylkill Asst. Warden); Dr. Walters,(Schuylkill's Psyc. Dr.); Mr. McFadden, Schuylk. ill's Captain;_
_Federal Bureau of Prisons,(Main office)._

IV. Statement of Claim

(State here as briefly as possible the facts of your case. Describe how each defendant is involved, including dates and places. Do not give any legal arguments or cite any cases or statutes. Attach extra sheets if necessary.)

1. _Please Refer To Plaintiff's Attached Civil Action Suit, "Argument V, Issue I."_

2. _Please Refer To Plaintiff's Attached Civil Action Suit, "Argument VI, Issue II."_

3. _Please Refer To Plaintiff's Attached Civil Action Suit "Argument VII, Issue III."_

2

**V.** **Relief**

(State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.)

1. *Please refer to pgs. 21, 22, 23 of Plaintiff's Complaint.*

(A). Grant punitive damages of $350.00 per day against each defendant; (B). Order Plaintiff, returned to general population, Mid Atlantic Region; (C) Order transfer on Plaintiff's behalf, to Mid-Atlantic Region; (D); Reinforce BOP Policy, pursuant to 28 C.F.R. § 541.22; (E). Grant 50,000.00, compensatory damages against Defendant, F.C.I., Schuylkill.

2. *Please refer to pg. 39-40 of Plaintiff's Complaint.*

(A) Grant punitive damages of $50,000.00, against each defendant, in their individual capacity; (B). Grant Compensatory damages of $550,000.00, together with interest, Cost and Litigant's fees, against Defendant, F.C.I. Allenwood.

3. *Please refer to Pg. 65 of Plaintiff's Complaint.*

(A). Grant punitive damages of $50,000.00, against each defendant, in their individual capacities; (B). Grant Compensatory damages of $750,000.00, together with interest, Costs, and Litigants fees, against Defendant, Northeast Regional Office, (BOP); (C). Order Plaintiff returned to general population, in the Mid-Atlantic Region; (D). Order Plaintiff transferred to Mid-Atlantic Region; (E) Reinforce BOP policy pursuant to 28 C.F.R. § 541.22, and Program Statements, 5270.07 and 5100.07.

Signed this __8th__ day of __June__, 20 __03__.

_____
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

__6/ 8/ 03__
(Date)

_____
(Signature of Plaintiff)

3

# FORMS TO BE COMPLETED BY PRISONERS FILING A CIVIL RIGHTS COMPLAINT UNDER 42 U.S.C. § 1983 or 28 U.S.C. § 1331

## COVER SHEET

THIS COVER SHEET CONTAINS IMPORTANT INFORMATION ABOUT FILING A COMPLAINT AND YOUR OBLIGATIONS IF YOU DO FILE A COMPLAINT. READ AND COMPLETE THE COVER SHEET BEFORE YOU PROCEED FURTHER.

**************************************************************************

The cost for filing a civil rights complaint is $150.00.

If you do not have sufficient funds to pay the full filing fee of $150.00 you need permission to proceed *in forma pauperis*. However, the court will assess and, when funds exist, immediately collect an initial partial filing fee of 20 percent of the greater of:

    1)    the average monthly deposits to your prison account for the past six months; or

    2)    the average monthly balance in your prison account for the past six months.

Thereafter, the institution in which you are incarcerated will be required to make monthly payments of 20% of the preceding month's deposits credited to your account until the entire filing fee is paid.

**CAUTION: YOUR OBLIGATION TO PAY THE FULL FILING FEE WILL CONTINUE REGARDLESS OF THE OUTCOME OF YOUR CASE, EVEN IF YOUR COMPLAINT IS DISMISSED BEFORE THE DEFENDANTS ARE SERVED.**

**************************************************************************

    1. You shall file a complaint by completing and signing the attached complaint form and mailing it to the Clerk of Court along with the full filing fee of $150.00. (In the event attachments are needed to complete the allegations in the complaint, no more than three (3) pages of attachments will be allowed.) If you submit the full filing fee along with the complaint, you DO NOT have to complete the rest of the forms in this packet. **Check here if you are submitting the filing fee with the complaint form.** _____

    2. If you cannot afford to pay the fee, you may file a complaint under 28 U.S.C. § 1915 without paying the full filing fee at this time by completing the following: (1) Complaint Form; (2) Application To Proceed In Forma Pauperis; and (3) Authorization Form. <u>You must properly complete, sign and submit all three standard forms or your complaint may be returned to you by the Clerk of Court.</u> **Check here if you are filing your complaint under 28 U.S.C. § 1915 without full prepayment of fees.** ✓

**Please Note:** If your case is allowed to proceed and you are awarded compensatory damages against a correctional facility or an official or agent of a correctional facility, the damage award will first be used to satisfy any outstanding restitution orders pending. Before payment of any compensatory damages, reasonable attempts will be made to notify the victims of the crime for which you were convicted concerning payment of such damages. The restitution orders must be fully paid before any part of the award goes to you.

## DO NOT DETACH THE COVER SHEET FROM THE REST OF THE FORMS

FILED
SCRANTON

JUN 11 2003

DEPUTY CLERK

# In The United States District Court For The Middle District Of Pennsylvania

Lent Christopher Carr, II,
Plaintiff,

– AGAINST –

Northeast Regional Office; M.E. Ray,
(Regional Director); F.C.I. Allenwood;
F.C.I. Schuylkill; Michael Zenk, (Allenwood
Warden); John Nash, (Schuylkill's Warden);
Lt. Womeldorf; Lt. Lyons; Lt. Litchard;
Lt. Kovauch; Mr. Shines; D. Sweets; Dr.
Walters; Mr. McFadden, (Schuylkill's former
Captain); Federal Bureau of Prisons.

\*CIVIL ACTION\*
SUIT

"COMPLAINT"

CASE NO.: _____

## I. COMPLAINT IN A BIVENS CIVIL ACTION

This is a Titled: Bivens Action, pursuant to, Bivens -vs.- Six Unknown Fed. Narcotics Agent, (1971) 403 US 388, 29 L.Ed. 2d 619, 91 S Ct 1999, filed by Lent Christopher Carr, II, (SSN) # 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, Reg. No. 18442-056; who is presently at the Federal Correctional Institution @ Schuylkill, Post Office Box 759, Minnersville, Pennsylvania, Zip-Code; 17954-0759. That alleges a violation of his Constitutional Rights, privileges, and immunities secured by the fifth, eighth, and fourteenth amendments to the Constitution of the United States of America, in that the Bureau of

Prisons, and its employed Supervising – Overseeing – Regents had the affirmative duty to maintain humane Conditions of Confinement, and take reasonable measures to guarantee the safety of Plaintiff Well-being. Their duty included protecting Plaintiff from violence at the hands of other prisoners, when they were put on notice afore-hand, that there were a strong probability that he may be raped, or worse, killed. Having stripped Plaintiff of virtually every means of self-protection and foreclosed his access to outside aid, the government and its officials are not free to let the state of nature take its course, as the above-captioned officials allowed to transpire, due to defendants deliberate indifference against Plaintiff, after he had initially reported to prison officials, and subsequently requested "Protective Custody" (PC) in light of threats of "physical and sexual assault" to his person; Plaintiff was thereafter subjected to a forceful and violent rape at the hands of other inmates, because of defendants reckless — disregard and inexcusable neglect, by ordering Plaintiff out of Protective Custody, being fully apprised of the actual threats on Plaintiff's person.

Defendant(s) gross and deliberate indifference toward Plaintiffs well-being, "serves no 'legitimate penological objective; any more than it squares with 'evolving standards of decency; thus, Plaintiff, who at this time is seeking Money damages, Punitive and Compensatory, request this Court, grant relief.

-2-

# II. JURISDICTION

1). This is a Civil Action Suit under <u>Bivens -vs- Six Unknown Fed. Narcotics Agents</u>, (1971) 403 US 388, 29 L.Ed. 2d 619, 91 S Ct 1999. This Court has Jurisdiction under 28 U.S.C. § 1331(a). Plaintiff also invokes the pendant Jurisdiction of this Court.

2). Defendant (S), <u>Northeast Regional Office, of the Federal Bureau of Prisons</u>, (hereinafter referred to as "Region"); Federal Correctional Institutions, "<u>Allenwood</u>" and "<u>Schuylkill</u>", is, and at all times material hereto, was an entity of the Federal Bureau of Prisons of the first class organized and existing under the laws of the Commonwealth of Pennsylvania and has the affirmative duty to make regulations and establish policies which and will effectively safeguard the health, safety and Constitutional Rights of its Prisoners.

3). This and all of Plaintiff Lent Christopher Carr, II's, Briefs and Motions to this Court should be treated under less stringent standards than that of an competent attorney since he is filing <u>Pro - Se</u> and had to prepare his brief in an institutions Solitary Confinement. <u>Haines -vs- Kerner</u>, 404 U.S. 519, 30 L.Ed. 2d 652, 92 S Ct 594 (1972).

-3-

# III. Statement Of Issues Presented
## For Review

## Issue I:

4). The F.C.I. Schuylkill's Segregation Review Official (SRO) et al., violated Plaintiff's " Procedural Due Process" and his "State-Created rights", which created a protectable liberty interest in Plaintiff's Case, when Schuylkill's Officials failed to adhere to their own Bureau Of Prisons Statute pursuant to, 28 C.F.R. § 541.22; resulting in an atypical, significant deprivation, of real substance, and not simply ephemeral and insubstantial Violations, when as in the Case of Plaintiff, he has been confined in administrative detention for four hundred twenty six (426) days; without having defendants, as required in Section 541.22 (C), Conduct periodic hearings before a Segregation Review Official ("SRO") to evaluate his Continued confinement in the Special Housing Unit ("SHU"), but defendants rather chose to simply disregard their own established policies. Thus, a clear violation of U.S.C.A. Const. Amends. 5 and 14 of the United States of America.

## Issue II:

5). The Eighth Amendment to the Constitution mandated that M.E. Ray, (Regional Director, for the Northeast Regional Office); Michael Zenk, (F.C.I. Allenwood's Warden); John Nash, (F.C.I. Scuylkill's

-4-

Warden), and other prison officials, maintain humane conditions of confinement, and take reasonable measures to guarantee the safety of Plaintiff's well-being. Their duty included protecting Plaintiff from violence at the hands of other prisoners: "Having stripped Plaintiff of virtually every means of self-protection and foreclosed his access to outside aid, the government and its' officials are not free to let the state of nature take its' course", as the afore-mentioned defendants allowed to transpire, due to their "deliberate indifference" against Plaintiff, when he initially reported to prison officials and requested Protective Custody (PC), in light of threats of "physical and sexual assault" to his person; Plaintiff was subsequently thereafter, subjected to forceful and violent rape at the hands of other inmates. Prison officials involved, gratuitously allowing the wanton rape of Plaintiff; fabricating the facts surrounding the eventual sexual assault, in order to attempt to cover their inexcusable neglect in the matter after defendants were put on notice that there was a real probability that Plaintiff may be raped, or even killed; and then to recklessly transfer Plaintiff from Allenwood F.C.I. to Schuylkill F.C.I., in the "same" said Northeast Region; a mere 40 min. from where Plaintiff was raped. Prison officials should've been alert, that by subsequently transfering Plaintiff from F.C.I. Allenwood to F.C.I. Schuylkill, only minutes away from where the initial rape occured would put Plaintiff

-5-

in a more vulnerable and susceptible position for repetitive
physical and sexual abuse by yet other predatory inmates.
Defendants gross and deliberate actions toward Plaintiff's
Well-being while he was under care and supervision, "serves
no 'legitimate penological objective; any more than it
Squares with 'evolving standards of decency.

## Issue III:

6). Bureau of Prisons Program Statements and other
Justice Department Rules, are considered laws of the United
States of America, and Plaintiff in the above referenced
Case, is emphatically entitled to expect the Bureau of Prisons
(BOP) to follow its' own statutes and policies. However, the
Northeast Regional Office, Federal Bureau of Prisons, under the
direct supervision of M.E. Ray, (Regional Director), who had the
duty to adequately review the case of Plaintiff, and to assure
that all reasonable steps necessary, in order to prevent
Plaintiff from being further victimized, not only from the
Vulnerabilities of repeated sexual assaults, by transfering
Plaintiff to another F.C.I. prison, where defendants should
have known that at some point, during Plaintiff's Redesign-
ation to F.C.I. Schuylkill; there would be at least one inmate
previously designated at F.C.I. Allenwood, would be transfered
to F.C.I. Schuylkill; and possibly rehash or inform other inmates
of the rape that took place at Allenwood of Plaintiff's

-6-

person, and Plaintiff's vulnerability as an easy target for repetitive sexual abuse. Furthermore, M.E. Ray had the sworn duty to adequately train, supervise, discipline and in other ways control his subordinates, in their exercise duty as sworn Bureau of Prisons Officers, to conduct themselves in accordance with the provisions to the Constitution of the United States of America and the Commonwealth of Pennsylvania; not to unconstitutionally and deliberately violate Plaintiff's Due Process and Eighth Amendment Rights. Had, before the actual initial aggravated sexual assault, and, had Lieutenants, Womeldorf and Lyons, of Allenwood F.C.I. taken Plaintiff's concerns and fears seriously, after he first requested Protective Custody (PC) prior to the assault; Plaintiff would have never been subjected to rape in the first place. And then to transfer Plaintiff, to F.C.I. Schuylkill, where he was again humiliated and taken advantage of by yet other sexually violent predators and additional sexual assault, because another inmate was transfered from Allenwood to Schuylkill; sewing seeds and rehashing that, after the rape of Plaintiff's person, at Allenwood, for all intent and purposes, he was a easy prey for sexual predators. But for M.E. Ray's ratification to his subordinates reckless indifferences to the safety and well-being of Plaintiff's person, after being duly informed of Officer's unconstitutional deprivations against Plaintiff; after reviewing Plaintiff's record, and Plaintiff's appeals to his office; therefore, without one doubt, shows, M.E. Ray, implicitly, authorized, approved or knowingly acquiesced in th unconstitutional conduct of the offending subordinates. -7-

# IV. Procedural Background

7). Lent Christopher Carr, II, Reg. No. 18442-056, who is presently incarcerated at the Federal Correctional Institution at Schuylkill, Post Office Box 759, Minersville, Pennsylvania; Zip-Code: 17954-0759; arrived at F.C.I. Schuylkill, on April 16, 2001, under a 323, Close Supervision transfer from F.C.I. Allenwood, after a subsequent rape or sexual assault on his person.

8). Lent Christopher Carr, II, (hereinafter referred to as "Carr"), was originally designated to, and arrived at F.C.I. Allenwood, Pennsylvania, July 11, 2000.

9). A True Bill of Indictment was handed down on June 3, 1999, from the Grand Jury containing seven counts alleging Carr had violated Title 18 of the United States Code (U.S.C.) §§ 844(i), 371, 1344, 1341, 1342 and 1510. An arrest warrant was issued thereafter. On June 21, 1999, Carr had an initial appearance in Raleigh, North Carolina before a United States Magistrate Judge. Carr appeared at that time without counsel and subsequently requested counsel appointment to represent him. Appointment of Counsel occurred on June 21, 1999.

10). On July 13, 1999, pursuant to Carr's Motion for substitute Counsel, new Counsel gave Notice of Appearance and requested discovery materials. On August 18, 1999, Carr was arraigned before the Honorable Malcolm J. Howard, District Court Judge,

-8-

Eastern District of North Carolina, Greenville. At that time, Carr pled not guilty to all Counts of the Bill of Indictment.

11). On July 18, 1999, the United States moved to have Carr examined for mental competency. Carr's Forensic, Psychological Evaluation, performed by Staff Psychologist, Dr. Daniel Carlson, Psy. D., Federal Medical Center, Rochester, Minnesota revealed that Carr suffered, socially, with a low intellect, with an IQ of 73 and a third grade reading level. Psychologically, Carr suffers from dysthmia, a panic disorder with agoraphobia, severe and recurrent major depression, generalized anxiety disorder, Conduct disorder, and Cognitive disorder. Physically, Carr has been diagnosed with seizure disorder, epilepsy, asthma, HIV and AIDS. Furthermore, medical staff at Central Prison in North Carolina and Rochester, Minnisota F.M.C., in whom performed Carr's psychological and medical evaluation, stated that the HIV and AIDS were not in remission stage, but that Carr was symptomatic, indicating possibly a 4-5 year life span left for him.

12). On October 8, 1999, a Superseding Bill of Indictment was filed in this matter, charging as follows:

Count One:   Violation of Title 18, United States Code (U.S.C.), § 844(i), Arson

Count Two:   Violation of Title 18, U.S.C. § 1341 and § 1342, Mail Fraud

Count Three:   Violation of Title 18, U.S.C., § 1341 and § 1342, Mail Fraud

Count Four:    Violation of Title 18, U.S.C., §1341
and § 1342, Mail Fraud

Count Five:    Violation of Title 18, U.S.C., § 371,
Conspiracy to commit Mail Fraud

Count Six:    Violation of Title 18, U.S.C, § 1344,
Bank Fraud

Count Seven:    Violation of Title 18, U.S.C. §1510,
Obstruction of Justice

13). On January 10, 2000, Carr entered a plea of guilty to Counts One, Five and Six of the Superseding Bill of Indictment. All other Counts of the Indictment were to be dismissed at the Sentencing hearing. A sentencing hearing was set for April 17, 2000, before the Honorable Malcolm J. Howard.

14). On April 17, 2000, a sentencing hearing was held before the Honorable Malcolm J. Howard. At that time, Counts Two, Three, Four and Seven of the Indictment were dismissed.

15). Carr was sentenced to 125 months for Counts One, Arson, and Six, Bank Fraud of the Indictment and 60 months for Count 5, Conspiracy to Commit Mail Fraud of the Indictment, to be served Concurrently for a total sentence of 125 months. Upon release, Carr is to be placed on supervised release for a term of 5 years total. He was also ordered as a Special Condition of Supervised release to pay restitution in the amount of Forty Five Thousand, Two Hundred Twenty One Dollars and Twenty-Four Cents.

16). Notice of Appeal was filed by Carr on April 26, 2000. The Fourth Circuit Court of Appeal heard Oral arguments on the appeal, on September 27, 2001. A decision was rendered on November 5, 2001, with the matter being remanded to the district Court for further Rule 11 proceedings and of such other and further proceedings as may be appropriate.

17). The Rule 11 remand hearing was held on March 4, 2002, before the Honorable Malcolm J. Howard, in the United States District Court for the Eastern District of North Carolina. An order was filed following that hearing on March 11, 2002. In that order Count One, (Arson), of the Indictment was dismissed and the sentence of 125 months on Count 6 and a Concurrent sentence of 60 months on Count 5 and all other provisions of the judgment dated April 17, 2000, were reaffirmed.

18). Subsequently, on March 13, 2002, Carr again Appealed the judgment of the district court, and is at this time awaiting a decision from the Fourth Circuit Court of Appeals.

19). Finally, on August 3, 2002, Carr filed with his Unit Team, his initial "Administrative Remedy Appeal," from the denial of his Close Supervision Transfer, of August 1, 2002. However, Unit Team Staff denied Carr's appeal, and Carr appealed to the Warden, John Nash's Office requesting redress of the denial of said transfer, pursuant to Administrative Remedy, BP-9. Carr's appeal again was denied, on October 2, 2002.

20). Consequently, after Carr's Institutional level appeals were denied, Carr then Appealed to the Northeast Regional Office, Federal Bureau of Prisons, requesting reconsideration of its' original denial of Carr's Close Supervision transfer, or alternatively, a Nearer To Release Designation transfer; closer to Carr's home and family, in North Carolina. Said transfer denial was August 1, 2002. The date of Carr's Regional Appeal was, October 10, 2002; thereby denied by M.E. Ray, Regional Director, on November 14, 2002.

21). Thereafter, on December 5, 2002, Carr finally Appealed to the Administrative Remedy Section of the Office of General Counsel, Federal Bureau of Prisons, and not long afterward, was denied any such relief therefrom, on January 16, 2003.

# V. Argument

## Issue I:

22). Did Segregation Review Official (SRO) violate Plaintiff's protectable "Liberty Interest Rights" grounded under the Federal Due Process rights, U.S.C.A. Constitutional Amendment 5, when he failed to formally conduct periodic Hearings, relating to Plaintiff's Continued confinement in Special Housing Unit (SHU), after his confinement of four hundred twenty six (426) days, pursuant to 28 C.F.R. § 541.22(c) ?

## Argument:

23). 28 C.F.R. § 541.22 (c) provides: (1) Except as otherwise provided in paragraphs (c)(2) and (c)(3) of this Section, the Segregation Review Official will review the status of inmates housed in administrative detention. The SRO shall conduct a record review within three work days of the inmate's placement in administrative detention and shall hold a hearing and <u>formally review</u> the status of each inmate who spends seven continuous days in administrative detention, and thereafter shall review these cases on the record (in the inmate's absence) each week and shall hold a hearing and review these

-13-

Cases _formally at least every 30 days_. The inmate appears before the SRO at the hearing unless the inmate waives the right to appear. A waiver may be in writing, signed by the inmate; or if the inmate refuses to sign a waiver, it shall be shown by a memorandum signed by staff and witnessed by a second staff member indicating the inmate's refusal to appear at the hearing. Staff shall conduct a psychiatric or psychological assessment, including a _personal interview_, when administrative detention continues beyond 30 days. The assessment, submitted to the SRO in a written report, shall address the inmate's adjustment to surroundings and the threat the inmate poses to self, staff and other inmates. Staff shall conduct a similar psychiatric or psychological assessment and report subsequent one-month intervals should detention continue for this extended period. Administrative detention is to be used only for short periods of time except where an inmate needs long-term protection (see: § 541.23), or where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns. An inmate may be kept in administrative detention for longer term protection only if the need for such protection is documented by the SRO. Provided institutional security is not compromised, the inmate shall receive a written copy of the SRO's decision and the basis for this finding after each formal review. The SRO shall release an inmate from administrative detention when reasons for placement cease to exist. 28 C.F.R. § 541.22 (c)(1).

24). However, in this case of Carr, he maintains, as a matter-of-fact, that he never received an Administrative Detention Order or any of the periodic "_formal_" hearings; as required by Section 541.22 (c).

25). Carr further contend, that defendant, Lieutenant Litchard, "Segregation Review Official" (SRO), (hereinafter referred to as "SRO"), after being questioned by Carr, as to why he has never received a detention order nor any such formal hearings as required and or specified in 28 C.F.R. § 541.22, the SRO's only affirmative reply was, "he nor any other staff member are required to give Carr or any other Inmate housed in SHU a formal hearing in regards to their continued confinement status, as any hearings regarding Carr's status in SHU, had been and would continue to be conducted informally, and outside of Carr's presence."

26). Subsequently, sometime thereafter, Carr's inquiry as to why SRO had not given Carr his mandated "formal" Review Hearings, defendant, Litchard prepared two consecutive, fabricated, "Special Housing Review Forms", dated January 30, 2003, and February 28, 2003. Moreover, said review forms were slid under Carr's assigned cell door by one of the defendant's Subordinates, on February 28, 2003. SEE: _I. A._ _00101 and 00102._

27). Furthermore, Carr asserts that the above-mentioned "Special Housing Review _Forms_" were falsified to wit, falsly documenting that Carr was given a Special Housing Review

hearing, formally that is, before the SRO concerning his continued confinement in SHU. It appears to be common practice for SHU/SRO Lieutenant's who are assigned to the Special Housing Unit on quarterly basis to deliberately ignore the Bureau of Prisons own customs and usages of their ordinances, regulations, under color of Statutes, more specifically, the provisions of 28 C.F.R. § 541.22 (c); which provides that, SRO "shall" hold a hearing and review these cases "_formally_", at least every (30) days. The inmate _appears_ before the SRO at the hearing unless the inmate waives the right to appear.

28). At all times material hereto, Carr has never waived his right to appear before the SRO, but rather, SRO took it upon himself to exclude Carr from such hearings, and falsely fabricate documents; the "Housing Review Form," stating Carr appeared for review hearings allegedly on January 30, 2003, and February 28, 2003, when, as a matter-of-fact, Carr has (never) been afforded the right to be present formally.

29). Carr has been housed in Administrative Detention for some four hundred twenty six (426) days, and has been forced to endure said gross Due Process violations through out his entire stay in SHU, and the rotation of two (2) consecutive SHU/SRO Lieutenant's, namely, the present SRO, Lieutenant Litchard, and the ~~~~~ former

-16-

SRO Lieutenant, Lieutenant Kovauch, who had
the duty to enforce the Bureau of Prisons policies
or regulations, but failed to adhere to their own
ordinance, thus, violating Carr's protectable liberty
interest rights, and the provisions of Const. Amends.
5 and 14.

30). In Anderson vs. Smith, 697 F.2d 239
(8th Cir. 1983), the Court held: "an Inmate is en-
titled to expect the Bureau of Prisons to follow
its' own policies". The following cases further cites
that validly issued administrative regulations has
the force and effect of the Law. Please refer
to; Wolf vs. McDonnel, 416 U.S. 539, 94 S.Ct. 2963,
41 L.Ed. 2nd 935 (1974), and Roadways vs. United
States, 514 F.2d 809 (D.C. Cir. 1975). Bureau of
Prisons Program Statements and other Justice Depart-
ment Rules, are considered Laws of the United States
of America. SEE: Abraham vs. United States, 463
F. Supp. 510 (D.C. Cir. 1979).

31). At all times relevant, although Carr person-
ally informed defendant(S), Lieutenant Litchard; Warden,
John Nash; Associate Wardens, Mr. Stines, and D. Sweet,
what he perceived to be ongoing violations of his
statutory rights under Section 541.22, and his Con-
stitutional rights, secured under the Due Process Clause;
each defendant personally and in concert, refused to

-17-

provide or attempt to provide the required hearings due Carr, thus, ignoring Carr's due process rights, even to this date.

32). Moreover, the Second Circuit, in <u>Tellier vs. Fields</u>, 230 F.3d 502 (2nd Cir. 2000), observed, as is case in point for Carr, that, "§ 541.22 give rise to a liberty interest on the part of federal prisoners". <u>Id.</u> at 610. The Court then noted that the Courts has repeatedly held that "state prisoners have a liberty interest in remaining free from administrative confinement where prison regulations 'specify certain conditions that must be met to permit a prisoner's placement' in such confinement." <u>Id.</u> (citing: <u>Soto vs. Walker</u>, 44 F.3d 169, 172 (2d. Cir. 1995); <u>Lowrance vs. Achtyl</u>, 20 F.3d 529, 535 (2d. Cir. 1994); <u>Russell vs. Coughlin</u>, 910 F.2d 75, 77 (2d. Cir. 1990); <u>Gittens vs. LeFevre</u>, 891 F.2d 38, 40 (2d. Cir. 1989)).

33). As stated supra., the gross violations of Carr's protectable liberty interest rights and his Due Process rights was atypical and significant, which involves a factual determination of the Court whether Carr's confinement of a total of four hundred twenty six (426), days in Special Housing Unit, without the required formal hearings being afforded him, satisfies the "atypical and significant hardship" requirement. SEE: <u>Miller</u>, 111, F.3d at 8-9.

-18-

34). Here, in the case of <u>Carr</u>, like <u>Tellier vs. Fields</u>, 230 F.3d 502 (2nd Cir. 2000), Carr has been confined in SHU for four hundred twenty six (426), days under conditions that differ markedly from those in the general population; i.e., Inmates in SHU are confined to their cells for twenty three (23), hours per day as opposed to six to seven hours per day, and they also have less access to the telephone, showers, recreation, the law library and certain "educational and rehabilitative programs" than do inmates in the general population. Further, unlike inmates in the general population, Carr was and is handcuffed whenever he is removed from his cell and is allowed no privacy while using the toilet. And as a matter of law his confinement is "atypical and significant". SEE: <u>Wright vs. Coughlin</u>, 132 F.3d 133, 136 (2d Cir. 1998).

35). A state "may under certain circumstances create liberty interest which are protected by the Due Process Clause", <u>Sandin</u>, 515 U.S. at 484, 115 S.Ct. 2293 (emphasis added). Furthermore, Circuit Courts has recognized that there is nothing in the <u>Sandin</u> decision that indicates that the Court intended to "create a per se blanket rule that disciplinary or administrative confinement may never implicate a liberty interest". <u>Miller vs. Selsky</u>, 111 F.3d 7, 9 (2d Cir. 1997).

36). Plaintiff notes that, although there are some debate among Courts, as to whether Section 541.22 Creates a protectable liberty interest, this Court and other Courts in this Circuit has held: "Section 541.22 and 541.15, are sufficient to confer a liberty interest". Maclean vs. Secor, 876 F. Supp. 695, 701-02 (E.D. PA. 1995); Von vs. Brennan, 855 F. Supp. 1413, 1417 (M.D. Pa. 1994); Frankenberry vs. Williams, 677 F. Supp. 793, 796 (M.D. Pa.), aff'd 860 F. 2d 1074 (3d Cir. 1988); and, Farmer vs. Carlson, 685 F. Supp. 1335, 1342 (M.D. Pa. 1988).

37). Under Hewitt, Courts considering the existence of an alleged liberty interest, must ascertain whether "statutes or regulations require, in 'language of an unmistakably mandatory Character', that a prisoner not suffer a particular deprivation absent specified predicates". Welch vs. Barlett, 196 F. 3d 389, 392 (2d. Cir. 1999) (quoting Hewitt, 459 U.S. at 471-72, 103 S.Ct. 864). Thus, Section 541.22 Contains such mandatory language and therefore creates a protectable liberty interest in this case of Carr.

38). When reviewing the text of Section 541.22, the text is replete with words such as "shall," "unless," and "only". Although the mere use of these words is neither dispositive nor talismanic, it supports Carr's argument that the Bureau of Prisons intended to guide the decision making power of prison officials by requiring that certain prerequisites be met and

Certain procedures be followed whenever a prisoner was subject to segregated housing. This Conclusion is most strongly supported by the last sentence of Section 541.22 (c), which instructs that "SRO shall release an inmate from administrative detention when reasons for placement cease to exist". 28 C.F.R. 541.22 (c)(1), (emphasis added).

39). Collectively, the foregoing features of the Bureau of Prisons regulations work to circumscribe prison officials' discretion in administrative detentions. Under these regulations, an inmate such as **Carr**, has the right to expect that placement decisions, i.e., (when an inmate will be continued in administrative detention, for the inmate's own protection; or if an inmate will require transferring from an institution, after being placed in SHU, for his personal safety), will be made and post-placement procedures will be applied consistent with the specified predicates and standards. Thus, these regulations are sufficient to confer a liberty interest, in the above-captioned case.

## "Relief Sought"

40). Plaintiff incorporates the allegations of paragraphs one through thirty-nine inclusive of this Complaint as though the same were fully set forth herein.

41). Defendant(s), John Nash, (Warden); Mr. Stine, (Associate Warden); D. Sweet, (Associate Warden); Mr. Litchard, ("Current" SHU/SRO, Lieutenant); Mr. Kovauch, ("Former" SHU/SRO,

Lieutenant), acted under the pretence and color of law and in their respective official and individual capacity.

42). Federal Correctional Institution, "Schuylkill", Bureau of Prisons' official's, John Nash, Mr. Stine, D. Sweet, Mr. Litchard, and Mr. Kovauch, acted willfully, knowingly and with the specific intent to deprive Plaintiff of his Due Process and Liberty Interest Rights, secured by the fifth, and fourteenth Amendment to the Constitution of the United States of America and by 42 U.S.C. §§ 1983 and 1985.

43). As a result, the above-described violations of Plaintiff's rights, has unnecessarily inflicted severe emotional abuse and distress upon Plaintiff, Lent Christopher Carr, II, which continues to this date.

44). WHEREFORE, Plaintiff, Lent Christopher Carr, II, demands judgment against Defendant (S), and respectfully request this Honorable Court, grant the below "relief" as set forth herein, as follows:

(A). Grant punitive damages of three hundred fifty ($350.00), dollars per day against "each" Defendant in their individual capacities, for every consecutive day Plaintiff has been housed in Administrative Detention without being afforded the right to formally appear before SRO, pursuant to 28 C.F.R. § 541.22.

-22-

(B). Order Plaintiff, returned to a suitable general population, in his respective "Region", the Mid-Atlantic Region.

(C). Order the Northeast Regional Office, to formally "transfer" Plaintiff to the Mid-Atlantic Region, (where Plaintiff's family resides, and where his home is), in the first instance.

(D). Reinforce Bureau Policy, according to 28 C.F.R. § 541.22.

(E). Grant Compensatory damages against Defendant, F.C.I. Schuylkill, in its' "Official" Capacity, in an amount not in excess of fifty thousand ($50.000.00), dollars, together with interest, cost and Litigant's fees.

-23-

# VI. Argument

## Issue II:

45). Did Defendant(s), F.C.I. Allenwood, et al. Violate Plaintiff's Eighth Amendment right, by way of, not maintaining humane conditions of confinement, and by not taking reasonable measures to guarantee the safety of Plaintiff's well-being, to wit, Plaintiff's desperate plea to Defendant(s), Womeldorf, and Lyons, "Allenwood's SIS Lieutenants," not to force him out of the safe havens of "Protective Custody," after they were fully apprised of other inmate's threats of rape and bodily harm to Plaintiff's person, thus, resulting in the brutal rape of Plaintiff's person ?

### Argument:

46). The Eighth Amendment to the Constitution of the United States of America, clearly mandated the Bureau of Prisons; M.E. Ray, (Northeast Regional Director); John Nash, (F.C.I. Scuylkill's Warden); Michael Zenk, (F.C.I. Allenwood's Warden); R. Womeldorf, and J. Lyons, (F.C.I. Allenwood's SIS Lieutenants), and other prison officials', maintain humane conditions of confinement and take reasonable measures to guarantee the safety of Plaintiffs well-being.

-24-

Their duty included protecting Carr from violence at the hands of other inmates or prisoners: "Having stripped Carr of virtually every means of self-protection and foreclosed his access to outside aid, the government and its' officials are not free to let the state of nature take its' course; as the afore-mentioned Defendants/Prison officials, allowed to transpire in this case of Carr. But for defendants deliberate indifference toward Plaintiff when he initially reported to prison officials, and subsequently, requested Protective Custody (P.C), after receiving threatening letters from anonymous inmates, with threats of physical and sexual assault to his person, Carr was thereafter, subjected to forceful, brutal and violent rape at the hands of other inmates.

47). Prison officials involved, gratuitously allowing the senseless rape and or sexual assault to Carr's person; fabricating the facts surrounding the eventual sexual attack, to cover their inexcusable neglect in this matter; and then to transfer Carr from F.C.I. Allenwood, to F.C.I. Schuylkill, a more preferment, predatory prison, in the "same" said Northeast Region, some forty (40) minutes away from where Carr was initially raped, is in all respects, "cruel and unusual punishment". Prison officials/defendants, should have been alert that by transferring Carr only minutes from where the first assault occured, would in all probability put Carr in a more vulnerable and susceptible position for repetitive physical and sexual abuse by other prisoners.

48). Defendant(s) gross and deliberate indifference toward Carr's well-being, "serves no 'legitimate penological objective, any more than it squares with 'evolving standards of decency; thus, Carr being violently assaulted in the Bureau of Prisons, was in no way part of the penalty that Carr had to pay for his alleged offenses against Society. SEE: E.g., _Farmer vs. Brennan_, 511 U.S.___, 128 L.Ed 2d 811, 114 S.Ct. 1970.

49). Moreover, here in the case of Carr, Defendant(S), Lieutenant, R. Womeldorf, and Lieutenant, J. Lyons, initiated the course of events, that led up to the gross rape of Carr, when the above-mentioned defendants, subjected Carr to reckless, cruel and unusual punishment in the month of October, 2000, subsequently, after ~~Carr~~ sought "Protective Custody" from defendants after receiving threatening letters from anonymous inmates, stating in pertinent part: "we know what your charge is, and we know that you burned down your home while your children was in it. So be aware, we're going to fuck the shit out of you, and make you our bitch, and then, we're going to slice your little throat in tiny pieces for setting that house on fire while those kids were in there." Although, F.C.I. Allenwood Lieutenant's Office initially provided Carr refuge, by placing him in the Special Housing Unit, (SHU), for protection purposes after the above-stated threatening letters of physical and sexual assault threats to Carr's person, the defendants, not long afterwards,

-26-

ordered Carr out of (SHU), and back to the Compound;
shortly thereafter, Carr was eventually forcefully,
and savagely raped, and cut by an inmate named,
Garcia-Suarez Everardo, Reg. No. 10689-180.

50). Had it not been for Defendant(s), R. Womeldorf
and, J. Lyons, reckless disregards, and their not taking
reasonable measures to abate the risks of Carr
being raped and beaten at the hands of a violent predator;
there is a strong probability that, had the defendants
taken Carr's fears and concerns seriously, after the
threatening letters; Carr would have never been subjected
to such a degrading rape, and physical assault to his
person.

51). As noted supra., Defendant(s), Bureau of
Prisons officer's "deliberate indifference" to the substa-
ntial risk of serious bodily harm to Carr, violated
Carr's established rights secured under the Eighth
Amendment to the Constitution of the United States
of America. SEE: Helling vs. McKinney, 509 U.S.___,
125 L.Ed 2d 22, 113 S.Ct. 2475 (1993); Wilson vs. Seiter,
501 U.S. 294, 115 L.Ed. 2d 271, 111 S.Ct. 2321 (1991);
Estelle vs. Gamble, 429 U.S. 97, 50 L.Ed 2d 251, 97
S.Ct. 285 (1976).

52). However, Carr does acknowledge that, the
Constitution "does not" mandate Comfortable prisons, Rhodes
vs. Chapman, 452 U.S. 337, 349, 69 L.Ed 2d 59, 101
S.Ct. 2392 (1981), but neither does it permits inhumane

-27-

ones. It has long been settled that "the treatment Carr receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment". <u>Helling</u>, 509 U.S., at ___, 125 L.Ed 2d 22, 113 S.Ct. 2475. Also, in its' prohibition of "cruel and unusual punishment," such as that of Carr, the Eighth Amendment places restraints, and did place restraints on the named Defendants/Officers, who may not disregard taking reasonable measures to guarantee the safety of Carr; but differing the guarantee under the Eighth Amendment, defendants clearly demonstrated their gross deliberate indifference, concerning the seriousness of the threatening, anonymous letters sent to Carr, when the defendants knew or should have known that by negligently forceing Carr back to general population, when they were fully aware of the threats made against his person would pose sufficient and serious danger of Carr being raped, physically assaulted, or worse, killed. SEE: <u>Hudson vs. McMillian</u>, 503 U.S. 1, 117 L.Ed 2d 156, 112 S.Ct. 995 (1992); also see: <u>Hudson vs. Palmer</u>, 468 U.S. 517, 526-527, 82 L.Ed 2d 393, 104 S.Ct. 3194 (1984).
In particular, Carr had every right to expect defendants to protect him from threats against his person, before it consumated into real harm. Thus, defendants had the duty to protect Carr from the violence that occured to him, but for their inexcusable neglect in the matter, Carr had to

endure such vile, repulsive, and degrading rape.
SEE: <u>Wilson vs. Seiter</u>, 501 U.S. at 303, 115 L.Ed 2d
271, 111 S.Ct. 2321.

53). At all times material hereto, on January
31, 2001, Plaintiff, Carr attended Allenwood's morning
breakfast with five other cell mates, however, with
the exception of inmate, Garcia - Suarez Everardo,
who did not attend early breakfast that morning. At
approx. 5:35 a.m., Carr arrived back to his assigned,
six man cell, cell No. 220, Unit 4-B. Carr then used
the restroom at approx. 5:40 a.m.; subsequently thereafter,
returning back to his bunk, where he eventually dosed
off to sleep. Not long after Carr had fallen asleep, he
was awaken to find inmate Garcia - Suarez, standing
over him, holding what appeared to be a sharp
prison-made shank (knife), to his throat, in the
vicinity of Carr's carotid artery. The attacker
then, while forcefully pinning Carr down to his
bunk, stated threateningly, "if you make one
fucking sound, or try to move, I'm going to cut
your damn throat". To be assured, he, Garcia, had
gotten his threat through to Carr, he proceeded to
slide the shank across the left side of Carr's
exposed neck; and then to the upper part of Carr's
back, causing lacerations to his neck and back. Garcia
then ran his tongue down Carr's back, to his lower

-29-

buttocks, while leaving his knife trained on Carr's throat. The perpetrator proceeded to order Carr to pull his boxer's down; and when Carr began protesting and pleading for Garcia not to take his man-hood away by raping him, Garcia pulled his knife away from Carr's throat, and started cutting the elastic band in Carr's boxer's, viciously, ripping the boxer's from beneath Carr, violently. Thereafter, placing his mouth, (from the back of Carr), on Carr's genital area, and anus. Although Carr, at that moment realized that he was about to be raped, and that should he attempt to fight against Garcia, he may be hurt further, or even killed; he tried to push Garcia's weight off of him, to no avail, when he realized that Garcia had his erect penis out of his own boxer's and was preparing to enter Carr's anus; Garcia gave Carr, at that point, an extremely hard blow to his head with his closed fist; dizzying Carr to the point of Semi-Consciousness. While Carr continued to lie prostrate on his bunk, Semi-Conscious, Garcia forced his penis into the soft tissues of Carr's anus violently, Thus, causing tremendous pain, severe tissue tearing, and bleeding; as he continued to force his penis in and out of Carr, over and over again.

-30-

54). ████ In furtherance, at approx. 6:30 a.m., subsequently to Carr being raped, and threatened by Garcia, not to say anything pertaining to the rape of his person; Carr arrived at the 4-b Unit Officer's Station, where he formally reported to the duty Officer, that he had been brutally raped and beaten, and could not stop the bleeding in his rectum. Not long thereafter, the officer in charge then contacted SIS, Lieutenant, Womeldorf, and was instructed to call the institutional hospital, and inform them that Inmate Carr was raped and that he was bleeding profusely; thereby needing immediate medical attention.

55). ████ After medical staff at Allenwood examined Carr and saw the extent of Carr's injuries, he was taken to an outside Rape Center, where rape Specialist assessed and treated Carr for said injuries, and prepared the neccessary rape report, after Carr's stabalization.

56). ████ Carr was returned back to F.C.I. Allen-Wood's Prison Facility that evening, at approx. 3:30 p.m., and under went interogation, headed by, SIS, Lieutenant's, Womeldorf and Lyons, surrounding the events of the rape of Carr that morning. However, Lieutenant's, Womeldorf and Lyons, during their interogation, falsely informed Carr, that

-31-

if he did not agree with them, thus, to change his
story about what actually happened to him that
morning; essentially, to submit their Coercion,
that the violent rape, that did in fact occured
on that morning, was Consentual; he would
receive an additional ten years in prison, and
he surely, would never live to ever again, see
his family.

57). ▓▓▓ Lieutenant's, Womeldorf and Lyons,
knowing, as a matter of record, that Carr
suffered, Socially with a low intellect, with an
IQ of 73 and a third grade reading level;
psychologically, from dysthmia, a panic disorder
with agoraphobia, Severe and recurrent major
depression, generalized anxiety disorder, conduct
disorder, and cognitive disorder; delibertly,
willfully, knowingly, and with specific intent
to take full advantage of Carr's disabilities,
in order for the named defendant's to shelter
or cover from their deliberate indifferences, and
inexcusable neglect, by forceing Carr, back to the
general population's Compound, after they had been
put on "full notice", prior to the rape of Carr,
that there was a Strong and real probability, after
before - mentioned threatening letters to Carr, stating
he was in danger of being raped, beaten, or even

-32-

killed by anonymous inmates, in relations to his Criminal charge; grossly violated Carr's Eighth Amendment right, secured under the Constitution of the United States of America. Had defendants taken Carr's concerns and fears seriously, and provided Continued protective Custody, Carr would have never been subjected to such a violent rape.

58). ■■■ Subsequently to Carr's interogation Conducted by defendants, and Carr's acquiesce to defendant's Coercion for Carr not to press Charges against Garcia; at approx. 6:45 p.m., Carr met with an unknown F.B.I. Agent, in the presence of defendants, Womeldorf and Lyons, along with a non-defendant, Doctor, Ron Bonner, Allenwood's Chief Psychologist, and re-told the Agent the events surrounding the rape of his person, ("refusing to go along with defendant's Coerced Version, that he allegedly consented to the brutal rape"). When asked by the agent, did he want to formally press charges against Garcia?, Carr stated, "no, he did not want to press Charges, all he wanted to do is put it all behind him," as he had been so grossly Coerced to by defendants.

59). ■■■ On February 21, 2001, a month after defendants Coercion, and the rape of Carr; Lieutenant, Womeldorf served an **unexpected**

-33-

incident report informally to Carr, by having it placed, or slipped underneath Carr's cell door, sometime in the middle of the night. Alleging that Carr violated Bureau of Prisons rules, of engaging in a sexual act, and lying or providing false information to a staff member. Also, in the said incident report, defendant, R. Womeldorf, proceeded to invent, and or fabricate that Carr allegedly, during the afore-mentioned interrogation, stated that on the day of the rape, Carr allegedly said that, "inmate Garcia came over to his bunk, while Carr was laying on his stomach, in his boxer's, and performed oral sex on him, and thereafter, Garcia then placed his penis in Carr's anus, thereby, going to far for Carr". The defendant went on to falsely claim, that during the interview with him, Carr also allegedly stated that, "he beggan to feel extremly guilty, and started to be mentally frustrated about what he allegedly allowed Garcia to do to him, so he tried to make up a story **because** of the guilt he was feeling. And lastly, the defendant fictitiously reported that Carr allegedly indicated, "the next thing he knew, he was down at th**e** officer's station, telling officer, Collister that he was raped". SEE: ~~J.A., 000103~~.

-34-

60). ▓▓▓ Plaintiff notes, that although defendants, Womeldorf claimed Carr allegedly made the above-mentioned, far-fetched statements; defendant, did not and could not, even to this very date, present one shred of definitive evidence, that Carr affirmatively made such non-seguitur, alleged statements.

61). ▓▓▓ On the other hand, had Carr provided defendants, under even a noncomposment's frame of mind, the alleged ficticious statements, then surely defendants, Womeldorf and Lyons, along with the unknown F.B.I. agent, would've, in all likelihood, had Carr write an affirmative state-ment, outlining his role in the alleged consential sex act, with details, and at the very least, would have prepared a sworn affidavit them-selves, detailing said alleged statements from Carr, and had him sign it, affirming that he did in fact, make the non-seguitur statements alleged by defendants.

62). ▓▓▓ Defendant(s), Womeldorf and Lyons, along with the unknown F.B.I. Agent, being sworn agents, servants and or employees under the umbrella of the United States Justice Department, pursuant to the customs and standards of the Department of Justice, would have, in all likelihood, had Carr retracted his

initial assertion, that Garcia, brutally, savagely, and forcefully raped him, prepared and furnished Carr with a Sworn Affidavit, having him sign it to the alleged effect, that he had consented to such. The reason defendants did not have Carr write any such statements of retraction, nor sign a Sworn Affidavit, is because the defendants deliberately, recklessly, and with specific intent to conspire with one another, in order to falsely fabricate, and or concoct their stories, in concert, all in hopes of removing all liabilities of the brutal sexual assault of Carr's person from them; thus, to cover their inexcusable neglect in their failure to protect Carr after he had practically begged the defendants for protective custody, even before the rape occurred.

63). ████ In furtherance, Dr. Ron Bonner, chief Psychologist, of F.C.I. Allenwood, corroborated Carr's contention before DHO's Hearing Officer, after the defendants so grossly falsified an incident report against Carr, claiming he consented to the sexual assault, when he testified as follow: "Dr. Bonner indicated that he has been involved with Carr, in Counseling sessions. Dr. Bonner indicated that he saw Carr on the day of the rape, and subsequently, several times afterward. Dr. Bonner stated that Carr has "always" maintained that he was forcibly raped. Dr. Bonner also asked

the DHO officer to consider that possibly Carr's statements to defendants, were misinterpreted by the reporting officer, (Lt. Womeldorf), since he, Dr. Bonner was with Carr and the defendants, during and in relations to Carr's actual statements, in the interview, that he was raped." SEE: I.A. 000104.

64). ▇▇▇ Moreover, Dr. Ron Bonner was Carr's Psychologist during and in relations to Carr's initial request for protective custody, and in all respects, along with Carr, tried to persuade Defendants, Womeldorf and Lyons, not to force Carr, out of protective custody; in that, not only would they expose Carr to a sufficiently substantial "risk of serious bodily harm" to his future health in general population, but, it also would expose Carr to further mental and emotional deterioration, in that, Carr already suffered with a low intellect, with an IQ of 73, dysthmia, a severe panic disorder with agoraphobia, severe and recurrent major depression, generalized anxiety disorder, conduct disorder, and cognitive disorder. SEE: I.A. 000105.

65). ▇▇▇ As a direct and proximate result of the injuries inflicted by the rape, at the hands of another prisoner; due to Defendants, Womeldorf, Lyons, and Federal Correctional Institution, Allenwood's deliberate indifference to the safety of Plaintiff, Carr's well-being,

Carr has undergone significant medical and psychological treatment, and may be required to incur medical and psychological expenses related to further future treatments.

66). ▓▓▓ As a further direct and proximate result of defendants/officer's actions, Plaintiff continues to suffer great physical pain, as well as mental pain and anguish, and has further been prevented from pursuing his usual course of daily activities.

67). ▓▓▓ At all times material hereto, the actions of the officers were committed with the knowledge and consent and under the supervision and direction of the Defendant(s), Michael Zenk, (Warden), and F.C.I. Allenwood Prison Complex, or were thereafter approved and ratified by said Defendants, or were committed to a custom of tolerance by said Defendants, regarding safeguarding the well-being of their inhabitants, to keep them from incurring serious bodily risk of harm to their person.

68). ▓▓▓ At all times relevant, Defendant(s), Michael Zenk, and F.C.I. Allenwood, had the duty to adequately train, supervise, discipline and in other ways control Correctional officers in the excercise SIS, Lieutenant functions, and in so doing, to monitor its' SIS Lieutenants conduct in accordance with the Constitution

of the United States of America and the Commonwealth of Pennsylvania.

69). At all times material hereto, Defendants, Michael Zenk, and F.C.I. Allenwood, had created a "State-Danger," by way of the SIS, Lieutenants' Office, that had poor training, that eventuated into a violation of Plaintiff's Eighth Amendment right, through Defendant(s), Womeldorf and Lyons inexcusable neglect and deliberate indifference, to protect Carr from the brutal rape and physical injuries that was subsequently sustained, due to defendants forcing Carr out of Protective Custody, after, and when they had been put on full notice that there were threats sent to Carr, to wit, threatenings of a possible rape, physical assault, and even death to his person, thus, Warden, Michael Zenk, and F.C.I. Allenwood are sued.

<u>"Relief Sought"</u>

70). Plaintiff incorporates the allegations of paragraphs one through sixty-nine inclusive of this Complaint as though the same were fully set forth herein.

71). WHEREFORE, Plaintiff, Lent Christopher Carr, II, demands judgment against Defendant(s), and respectfully request this Honorable Court, grant the below "relief" as set forth herein, as follows:

-39-

(A). Grant punitive damages of fifty thousand ($50,000.00), dollars against each of the Defendant(S), in their individual capacities.

(B). Grant compensatory damages, in an amount not in excess of five hundred fifty thousand ($550,000.00), dollars, together with interest, Cost and Litigant's fees, against Defendant, F.C.I. Allenwood.

# VII. Argument

## Issue III.:

72). Are the Federal Bureau of Prisons Program Statements considered "Laws" governed under the United States of America?, if so, by the Northeast Regional Office, Federal Bureau of Prisons, et al., not adhereing to its' own Bureau's established policies pursuant to Program Statements 5100.07, Chapt. 10, pg. 4, and, 5270.07, Chapt. 9, pg. 6, when they, (1). kept Plaintiff in Administrative Detention beyond the ninety (90) days requirement, pursuant to P.S. 5270.07, without transferring him and returning him to a more safer and suitable general inmate population, thus, forceing Plaintiff to endure further inhumane conditions of confinement, for four hundred twenty six (426), days without Due Process; (2). when Defendant(s), subsequently, after a brutal rape of Plaintiff person, negligently transferred Plaintiff to F.C.I. Schuylkill, only minutes from where the initial sexual assault occurred, and markedly, a far more violent and sexually, predatory infested Prison, than that of the Prison, prior to transfer, thus, Defendants should have been on alert, that by placing Plaintiff in such conditions, would put him in a more susceptable position for repetitive sexual abuse by other prisoners; therefore, did Defendant, M.E. Ray, (Northeast Regional Director), et al., violate Plaintiff's Due Process rights under Constitution Amend. 5, and his 8th Amend. rights, by subjecting him to such deprivations?

## Argument:

73). Bureau of Prisons' Program Statements and other Justice Department Rules are considered "Laws" of the United States of America, <u>Abraham vs. United States</u>, 463 F. Supp. 510 (D.C. Cir. 1979), and Plaintiff, Carr, in the above-referenced case, is emphatically entitled to expect the Bureau of Prisons (BOP), to follow its' own Statutes and or policies. Moreover, in <u>Anderson vs. Smith</u>, 697 F. 2d 239 (8th Cir. 1983), the Court held: "an Inmate is entitled to expect the Bureau of Prisons to follow its' own policies". The following cases further cites that validly issued administrative regulations have the force and effect of the "Law". Please refer to; <u>Wolf vs. McDonnel</u>, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed 2d 935 (1974), and <u>Roadways vs. United States</u>, 514 F. 2d 809 (D.C. Cir. 1975).

74). However, the Northeast Regional Office, Federal Bureau of Prisons, under the direct supervision of M.E. Ray, (Regional Director), who had the duty to adequately review the case of Carr, and to assure that all reasonable steps necessary would be made, in order to further prevent Carr from being victimized, to wit, the Vulnerabilities of repetitive sexual assaults, after Defendants were duly notified, by way of a Closer Supervision, "323" transfer referal from F.C.I. Allenwood's staff, subsequently, after a brutal rape of Carr's person.

75). By transferring Carr to F.C.I. Schuylkill, markedly, a far more violent, sexually assaulting, and predatory infested Prison, than that of Allenwood F.C.I.; only minutes away from where Carr was initially savagely raped at the hands of another Prisoner; and in the same said Northeast Region; Defendants, M.E. Ray, (Regional Director), Michael Zenk, (F.C.I.'s Warden), and et al., did know, or should have known, that by negligently transferring Carr to such conditions, would in all probability, put Carr into a more susceptible position for repetitive sexual abuse by yet other prey seeking prisoners.

76). In furtherance, the above-mentioned defendants, did, or should have known that at some point during Carr's redesignation to F.C.I. Schuylkill, approx. 40 min. from F.C.I. Allenwood, that there would be other inmate transferrals, or at least one inmate previously designated at the Allenwood Prison facility during the time of the rape of Carr; who would be transferred also to F.C.I. Schuylkill, and thereby, possibly, rehash or inform other inmates of the rape that occurred at Allenwood, and Carr's vulnerability as a easy target for repetitive abuse, sexually and physically. Thus, defendants actions mounted to nothing less than deliberate indifference, and inexcusable neglect.

-43-

77). The Eighth Amendment to the Constitution of the United States of America, mandated the Bureau of Prisons; M.E. Ray, (Northeast Regional Director); John Nash, (F.C.I. Schuylkill's Warden), and other prison officials', to maintain humane conditions of confinement, and to take reasonable measures to guarantee the safety of Plaintiff's well-being. Their sworn duty included protecting Carr from further violence at the hands of other prisoners; to protect Carr from unnecessary and wanton of inflictions of mental and emotional abuse, when, (as is was in this case of Carr); Defendants had it fully in their control and power, to prevent further psychological trauma to Carr's being: "Having stripped Carr of virtually every means of self-protection, and foreclosed his access to outside aid, the [government and its' officials], are not free to let the state of nature take its' course.

78). At all times material hereto, and discussed more fully in ("paragraphs forty-five through seventy-one") of this complaint; On January 31, 2001, Plaintiff, Carr was subjected to a violent rape, at the Allenwood, Prison facility, that in all respects, could've been prevented, had prison officials/defendants, took Carr's concerns and fears seriously, and not, after he was placed in Protective Custody, negligently forced Carr back to general population, when, as Defendants were fully apprised and put on notice that there existed a real possibility, to wit threatening

-44-

letters to Carr, that he would be raped, or worse,
killed at the hands of anonymous prisoners.

79). Then, after Defendants, had so gratuitously
allowed the senseless rape of Carr's person; grossly
subjecting Carr to their threats and coercion; and knowing,
as a matter of record, that Carr suffered, socially with
a low intellect, with an IQ of 73 and a third grade
reading level; psychologically, from dysthmia, a panic disorder
with agoraphobia, severe and recurrent major depression,
generalized anxiety disorder, Conduct disorder, and Cognitive
disorder; Defendant(s), Michael Zenk, (Allenwood's Warden),
and M.E. Ray, (Northeast Regional Director), Chose to treat
Carr's case nonchalantly, after subsequently ratifying or
approving of their subordinate's deliberate indifference
toward Plaintiff's well-being; negligently, and with total
disregard, M.E. Ray, transfers Carr to F.C.I. Schuylkill,
markedly, a more pronounced, and violent prison setting
where it is or was common-place for vulnerable Inmates,
such as Carr, to undergo sexual, physical, and mental abuse
on a daily basis.

80). Carr was, (subsequently to the rape of his person),
redesignated to, and arrived at F.C.I. Schuylkill, on
April 16, 2001. During and in relation to Carr's arrival to
Schuylkill, Carr was given a initial interview by the
Institution's "Former" Captain and Chief Psychologist,
Doctor Walters, and was told in said interview, in

-45-

no uncertain words; "Mr. Carr, before we release you to the Compound, be assured, that we will not pamper you here at Schuylkill, and as far as your being sexually assaulted at Allenwood, which is the reason you are here; we don't know the details concerning your alleged assault, but, you are just going to have to adjust; men are sexually assaulted in prison every day, but don't come crying to me, (the former Captain), if you do encounter any sexual abuse, because I'm too busy as it is, and the only thing I'm going to do is make you sit in SHU for Eighteen months; just keep it to your-self and deal with it." As the interview went on, Dr. Walter's also stated in pertinent part: "I know the circumstances surrounding your case, and I have spoken with Dr. Bonner, (Chief Psychologist For Allenwood), so I am aware of your mental and emotional disorders, but, Mr. Carr, Dr. Bonner held your hand at Allenwood, I will not; as a matter of fact, should you claim that you are sexually assaulted on the compound, true or not, please understand, and understand well, you will be placed in SHU as the Captain has already stated, and don't expect me to be coming down there; you'll have to deal with it your self. And one more thing, when something happens to you, like at Allenwood, keep to your self, and you'll make it."

-46-

81). Not long thereafter, Carr was assigned to Unit 2-B, where most of Schuylkill's "problem Case Inmates" are housed, and again placed in a Six man Cell, like that of Allenwood. Some time later, in and about the month of June, 2001, through the month of January, 2002, when another Inmate who was housed at Allenwood during and in relation to the brutal rape of Carr, was transferred to Schuylkill and informed other inmates about the subsequent rape; Carr was again subjected to sexual abuse by Schuylkill's notorious "D.C. Gang Banger's", who, on a numerous occasions forced Carr to Copulate gross and the most demeaning sexual acts, i.e., oral sex, anal sex, and etc.

82). At all times material hereto, but for Defendants, F.C.I. Schuylkill's "Former" Operations Captain, and its' Chief Psychologist, Doctor Walters, direct threatening — warnings to Carr, to wit, their negligent and explicit instruction, or direct orders to Carr, to keep silent should he endure sexual abuse at the hands of other prisoners, or else, Carr basically Could look forward to additional unusal punishment, of being locked in Solitary confinement for Eighteen months for any pleas or crys for help and protection.

83). Defendants, gross and deliberate indifference toward Carr's Well-being, "serves no legitimate penological objective, any more than it Squares With 'evolving Stand-

-47-

ards of decency; thus, Carr being violently assaulted, mentally and emotionally abused in the Federal Bureau of Prisons, was in no way part of the penalty that Carr had to pay for his alleged offenses against Society. SEE: E.g., <u>Farmer vs. Brennan</u>, 511 U.S. ___, 128 L.Ed. 2d 811, 114 S.Ct. 1970.

84). Furthermore, in and about January 2, 2002, following a Remand Order from the Fourth Circuit Court of Appeals, vacating Count One, Arson, of the Criminal Indictment against Carr, and the District Courts subsequent dismissal of Count One; Carr, after a Federal Writ, was allowed the privilege to meet and converse personally, with his immediate family for the first time, (since being transferred and sexually assaulted in the Northeast Region three years earlier), at the Pitt County Detention Center, Greenville, North Carolina; where he expressed his concerns and fears of being subjected further to gross sexual abuse at the hands of other extremely predatory prisoners, should he be transported back, after the Remand, to F.C.I. Schuylkill, and his not knowing what to do next, in that Defendants made it Crystal clear to him, "if he encountered any sexual abuse while housed at Schuylkill, he should keep it to himself, and just deal with it, or else, he would spend Eighteen months or more in Solitary Confinement".

85). At all times relevant, during and in relation to Carr's visitation with his family; Carr being psychologically and emotionally deranged due to his being sexually assaulted, and coerced by Defendants, Schuylkill's former Captain, and Dr. Walters, not to say anything should he experience further assaults, and the inhumane conditions of his confinement on Schuylkill's compound; Carr's family encouraged him to immediately report to prison officials, in the event he should be presured by any other inmate, to perform anymore such gross and degrading sexual acts, upon his arrival back to the Institution. Therefore, reason for Carr's decision to again, request Protective Custody, regardless of defendants negligent warnings or threats to keep him in Solitary Confinement for his request to them for protection from any further sexual and mental abuse.

86). Although, for the sake of argument, it can be said that one of Schuylkill's Lieutenants, Lieutenant Snyder did at the time of Carr's request for protective custody on April 2, 2002, did take Carr's concerns seriously, and placed him in (P.C.), after he was again sexually assaulted on that same day, (only one day after his return back to F.C.I. Schuylkill), by D.C. gang members, as well as threatened to wit, more physical abuse; it does in no way excuse Defendants reckless disregard and deliberate indifference towards Carr's safety and well-being, not to have to endure such needless wanton infliction of mental pain and anguish.

-49-

87. As stated earlier, Carr was subsequently placed in Administrative Detention, following the sexual assaults of his person, pursuant to Bureau of Prisons, Program Statement 5270.07 and 28 C.F.R. § 541.23, which provides:

a. Staff may consider the following categories of inmates as protection cases:

(1). Victims of inmate assaults;

(2). Inmate informants;

(3). Inmates who have received inmate presure to participate in sexual activity;

(4). Inmates who seek protection through detention, claiming to be former law enforcement officers, informants, or others in sensitive law enforcement positions, whether or not there is official information to verify the claim;

(5). Inmates who have previously served as inmate gun guards, dog caretakers, or in similar positions in state or local correctional facilities;

(6). Inmates who refuse to enter the general population because of alleged pressures from other un-identified inmates;

-50-

(7). Inmates who will not provide, and as to whom staff cannot determine, the reason for refusal to return to the general population;

(8). Inmates about whom staff has good reason to believe the inmate is in serious danger of bodily harm.

(88). Also, as validly issued, in Program Statement (5270.07, Chapt. 9, pg. 11, para. C.); "Ordinarily, staff may place an inmate in administrative detention as provided in paragraph (a) of this rule relating to protection cases, for a period not to exceed 90 days. Staff shall clearly document in the record the reasons for (any extension beyond this 90-day period)."

(89). Importantly, from the outset, Carr has repeatedly inquired to Schuylkill's staff, as to what was, or is the reason for their apparant disregard in this case of Carr, in that, pursuant to P.S. 5270.07; "inmates in categories (a), 1-5 of this section, (on protection cases), are not to be extended beyond 90 days unless there are exceptional circumstances and approval is obtained from the appropriate Regional Correctional Service Administrator. Albeit, to this very date, Schuylkill's staff has refused to provide, or even show any such exceptional circumstances existed to warrant any extension, over the required

90 day limitation period, to either return Carr to general population, (which was not practical in this case of Carr), or alternatively, refer the case, with all material, to the Regional Director, who, upon review of the material, may order Carr transferred, as this is a protection case. SEE: P.S. 5270.07, Chapt 9, pg. 11, para. (d).

90). Granted, in the month of July 2, 2002, and Carr concedes, that Schuylkill's staff submitted a Close Supervision Transfer referal to the Northeast Regional Office for a transfer recommendation, in order to have Carr transferred, for protection purposes; however, in regards to staff at Schuylkill adhereing to their own Bureau's Program Statement requirement, not to exceed the 90 days period, to either return Carr back to the general population, or to alternatively, refer Carr's case to the Regional Director, with a transfer recommendation; staff blantly refused to adhere to the provisions, as provided in Program Statement 5270.07, when they held Carr in Administrative Detention from April 2, 2002 to July 2, 2002, for a total of ninety one (91) days, without due process. Thus, violating Carr's 5th Amendment Rights to the Constitution of the United States of America, and his Protectable, Liberty Interest Rights.

-52-

91). In furtherance, <u>Program Statement 5270.07,</u> <u>Chapt. 9, pg. 11, para. (d)</u>, also provides: "Where appropriate, staff shall first attempt to place the inmate in the general population of their particular facility. Where inappropriate, staff shall clearly document the reason(s) and refer the case, with all relevant material, to their Regional Director, who, upon review of the material, may order the transfer of a protection case.

92). As noted supra., Carr concedes, that Schuylkill's staff, did, on July 2, 2002, submitted a transfer referral to the Northeast Regional Office's, Regional Director, M.E. Ray; clearly documenting the reason for the Closer Supervision transfer referral on the behalf of Carr, to wit; Carr's subjection to sexual assaults, at the hands of other prisoners; therefore, providing M.E. Ray, (Regional Director), with all relevant material, who, after review of the material in the case of Carr, should have ordered Carr, transferred from F.C.I. Schuylkill, in the interest of Justice; not to mention, staff had good reason to believe that Carr was in danger of repetitive sexual abuse, and serious danger of further bodily harm.

93). Notwithstanding, M.E. Ray, Regional Director, being provided all the relevant material from staff at F.C.I. Schuylkill, stating the unequivocal facts relating to the gross sexual assaults upon Carr's person, and Carr's subsequent Regional Appeal, requesting redress of M.E. Rays' denial of Plaintiff's

-53-

"Closer Supervision Transfer", along with the mitigating circumstances in this case of Carr, i.e.; Carr suffering socially with a low intellect, with an I Q of 73 and a third grade reading level; psychologically, from dysthmia, a panic disorder with agoraphobia, severe and recurrent major depression, generalized anxiety disorder, and numerous life threatening medical problems; M.E. Ray chose to deliberatly, willfully, knowingly, and with specific intent, inexcusably forced Carr, (after the assaults perpetrated by other violent prisoners), to endure further psychological and emotional trauma, by ordering Carr to complete a full year in Administrative Detention, in a cell no larger than a 12' X 8' closet.

94). Had M.E. Ray, adequately reviewed, with due dilegence, the entire facts and mitigating circumstances in this case of Carr, surely he would have been on alert that by not transferring Carr from F.C.I. Schuylkill, under such inhumane conditions of sexual, physical, and mental abuse from said predatory and violent prisoners, would inadvertently and unnecessarily, further aggravate Carr's documented psychological and emotional instabilities. And had M.E. Ray, fully or even reviewed the information in regards to Carr's psychological deficits, he should or would've known, that by even negligently placing Carr in a (SHU) cell, the size of a walk-in closet, @ approx 12' x 8', for an extended period of twelve-months; would seriously compromise Carr's mental and emotional health and well-being.

-54-

95). At all times material hereto, the actions of the (Northeast Regional Director), M.E. Ray, were committed with the knowledge and consent and under the supervision and direction of the Defendant (5), Federal Bureau of Prisons, or were thereafter approved and ratified by said Defendants, or were committed pursuant to a custom of tolerance by said Defendants, regarding not adhereing to their own Bureau's policies to adequately review all the relevant facts of each case, and the mitigating circumstances of certain cases, like that of Larr.

96). At all times material hereto, Defendant, Federal Bureau of Prisons, had the duty to adequately train, supervise, discipline and in other ways control its' Elected, Northeast Regional Director, M.E. Ray, in his exercise Official Director functions, and, in so doing, to monitor his conduct in regards to the adhereance of its' established Policies/Program Statements, pursuant to 5270.07 and 5100.07, in accordance with the Constitution of the United States Of America, and the Commonwealth of Pennsylvania.

97). At all times material hereto, Defendant, Northeast Regional Office, is an extention connected and Supervised-Overseen-Regent, by the United States Department of Justice, Federal Bureau of Prisons, who is ultimately responsible for the training and

-55-

supervision of the Northeast Regional Office personnel in Philadelphia, Pennsylvania, which includes "M.E. Ray, Regional Director, and the Regional Correctional Services Administrator."

98). At all times material hereto, Defendant M.E. Ray, was and is a duly appointed "Regional Director", employee and agent of the Northeast Regional Office, Federal Bureau of Prisons of Pennsylvania, and at all times material hereto, who was the Official-In-Charge, acting both individually and in his official capacity, under the color of the laws of the Commonwealth of Pennsylvania and the City of Philadelphia.

99). At all times material hereto, M.E. Ray, had the duty, in the exercise of Regional Director functions, to adhere to the custom and standards of the Bureau of Prisons Program Statements, as authorized and or supervised by the Defendant; U.S. Department of Justice, Federal Bureau of Prisons, of Washington D.C.

100). During all times material to Plaintiff's cause of action, the Defendants acted under color of the statutes, ordinances, regulations, and customs and usages of the Northeast Regional Office, Federal Bureau of Prisons, and the U.S. Department of Justice, Federal Bureau of Prisons. Each of the officials herein, separately and in concert, pursuant to their authority

as agents, servants and employees of the Defendant, Federal Bureau of Prisons, intentionally and deliberately engaged in the unconstitutional conduct described herein, thereby depriving Carr of the rights, privileges, and immunities secured by the fifth, eighth, and fourteenth amendments to the Constitution of the United States of America, and the rights secured by the Constitution of the Commonwealth of Pennsylvania.

101). As a direct and proximate result of the unconstitutional injuries inflicted by the Northeast Regional Office's, Regional Director, M.E. Ray; Carr has undergone significant Psychological treatment and may be required to incur Mental Health expenses; related to the mental and emotional trauma inflicted by said Defendant in the future.

102). As a further direct and proximate result of M.E. Ray's, actions; Carr continue to suffer great physical pain as well as mental pain and anguish, and has further been prevented from pursuing his usual Course of daily activities.

103). Importantly, in a Memorandum, to Warden, John Nash, from the Northeast Regional Director, M.E. Ray; dated: July 26, 2002; Defendant, M.E. Ray stated his reason for denying Carr's Close Supervision Transfer, with the vaguest of reasoning as follows: "We have reviewed your request for transfer of the above-referenced

inmate (Carr). At this time, we do not feel a
close supervision transfer is appropriate." Defendant,
M.E. Ray, went on to further state in the afore-
mentioned "Memorandum", to Warden, Nash; that,
"he, (Carr) should remain at your institution at least
12-months with clear conduct prior to transfer."
SEE: J.A. 000106.

    104). Even with M.E.Rays, unjustifiable reason
for denying Carr's "Closer Supervision Transfer",
along with instructing F.C.I. Schuylkill staff to
detain Carr in (SHU) for a period of 12-months,
thereby violating the provisions of Program Statements
5270.07 and 5100.07; had M.E. Ray, adequately, as
provided in P.S. 5100.07, Chapt. 10, pg. 2, reviewed all
relevant material i.e., Warden's referral memo-
randum; Presentence Investigation Report; Carr's
Current Progress Report; the Close Supervision
investigation report; Plaintiff's Intelligence data;
Supporting Memorandum; and, Carr's complete
Psychological Evaluation datas'; surely he would have,
or should have known that by subjecting Carr to
such confinements would consequently and unnecessarily
further the wanton infliction of mental pains and
anguish to Carr's immediate and future psychological
stabilities. And had Defendant, M.E. Ray, reviewed
only half of the mentioned information in Carr's file,

-58-

or transfer recommendation package; he would, at the very least made arrangements for Carr to be transferred to a suitable Federal Medical Facility, or (FMC); not further subject him to a surrounding, (Schuylkill), where he had in fact been brutally sexually assaulted, abused physically, mentally and emotionally at the hands of hell-bent sexual predators, who continue to this date, abusing unsuspecting victims like that of Carr.

105). At all times material hereto, Defendants, M.E. Ray, (Regional Director), and the Northeast Regional office, Federal Bureau of Prisons, had in place a negligent, "Regional Wide" transfer Policy or Memorandum concerning Inmate Transfers, that was shoddy and markedly out of sync or harmony with the guiding principle of the "Bureau of Prisons" Program Statement 5270.07, Chapt. 9, pg. 6-9, (Placement in Administrative Detention), which requires a Regional Director, M.E. Ray, included, to effect a transfer, thereby transferring an "Administrative Detention Inmate" to a more suitable institution, or shall either return the inmate to the general inmate population. Either one of the two scenarios are to be done within (90) ninety, days of an inmate's placement in Administrative Detention.

106). Plaintiff notes, that the latter of the above two scenarios would or could not apply in his individual situation, being as Carr was grossly subjected to

-59-

sexual assaults and his life would be in immediate danger, therefore, Carr could not return to the general inmate population at Schuylkill. However, within the required (90) ninety, days period of Carr' being placed in Administrative Detention or Protective Custody, Defendant, M.E. Ray, should have adhered to his own Bureau's Policy, and effected or approved Carr's Closer Supervision transfer to a suitable institution in the Federal Bureau of Prisons.

107). Notwithstanding, Defendant, M.E. Ray, chose to take on a "relaxed attitude" concerning the safety and transfer of Carr to a suitable institution, pursuant to P.S. 5270.07; within the mandated (90) ninety days time limit, and has consequently deprived Carr of his Due Process rights and his protected Liberty Interest rights to the Constitution of the United States of America, and has as well, prolonged Carr's mental and emotional sufferings for some four hundred twenty six (426) days, without due process.

108). Moreover, the unconstitutional Memorandum Policy that Defendant, M.E. Ray, implemented requiring Protective Custody Inmates to remain in (SHU) for one (1) year, not only goes against the already established Bureau of Prisons Program Statements, 5270.07 and

-60-

5100.07, it also has further aggravated Schuylkill's already over-crowded Inmate Prison population, thus, causing SHU Inmates, Carr included, to have to live in an overcrowed 12' x 8' Cell with three (3) fully grown men/inmates; thereby, violating the building Code requirement, that only two (2) inmates Cell together in such cramped space; top and bottom bunks only, not the cold Cement floor.

109). Finally, after Carr had provided Defendant, M.E. Ray, with a vast amount of documentation, requesting redress from the denial of his Closer Supervision transfer, by way of Appeal to the Northeast Regional Office on October 10, 2002; Defendant, M.E. Ray, again treated Carr's meritorious Contentions nonchalantly, even though he was duly supplied a copy of Carr's Psychological Evaluation Report, from the Federal Medical Center, Rochester, Minnesota, and ordered by the Honorable, Malcolm J. Howard, District Court Judge for the Eastern District of North Carolina, stating as follows: "Carr suffers, socially with a low intellect, with an IQ of 73 and a third grade reading level; psychologically, from dysthmia, a panic disorder with agoraphobia, severe and recurrent major depression, generalized anxiety disorder, Conduct disorder, and Cognitive disorder. SEE: J.A. 000105.

-61-

Foot Note: 1. Also SEE: J.A. 000108, Adm. App. (

110). At all times material hereto; not only did Defendant, M.E. Ray, disregard Carr's mitigating factors concerning his psychological deterioration, to wit, Carr's extended stay in administrative detention for a period of (12) twelve, months after the senseless sexual assaults on Carr's person at Schuylkill; but when one reviews M.E. Ray's, submarginal, nonsequitur response to Carr's Administrative Appeal to the Northeast Regional Office, the reasoning M.E. Ray, gives as to why he subsequently denied Carr's Closer Supervision Transfer, is totally insufficient, and without logic to the thinking mind, to even draw a base conclusion for such denial.

111). In M.E. Ray's, reply to Carr's Administrative Appeal, he states: " Record indicate you were placed in administrative detention on April 2, 2002, pending investigation and protective custody. Following completion of the investigation, you remained housed in administrative detention because you were unable to re-enter the general population at F.C.I. Schuylkill. You were submitted for a transfer and on July 26, 2002, the transfer was denied. You were advised you must remain at the institution for a period of 12 months clear conduct prior to resubmission of a transfer request. The institution will continue to review your status in administrative

detention to determine when you may be returned to general population." Now, M.E. Ray, by not making any definitive statements as to why he initially refused to transfer Carr to a suitable institution following the sexual, physical, and psychological abuse Carr sustained at Schuylkill, notwithstanding, Carr's Psychological and emotional deterioration after being held in SHU for an unjustifiable extended period of time; without a more definitive explaination after being provided such vast documentation, not only from F.C.I. Schuylkill, but directly from Plaintiff on appeal, shows that Defendant, M.E. Ray, did nothing less than, abuse his official discretion See: J.A. 000107.

112). Interestingly, it appears to be Common practice for the Northeast Regional Office's Regional Director, M.E. Ray, and his appointed Regional Designator, for the last past year, to automatically and with total disregard to each (SHU) housed Inmate who was submitted for a "Closer Supervision" transfer, for whatever reason specified, was flat-out denied, and approx. fifty (50), sum odd Inmates was forced wrongfully to endure such stringent conditions without due process of law. Moreover, when Carr and other inmates inquired, as to why so many transfers were being denied, even for Inmates such as Carr, who was not submitted for disciplinary reasons, but because their life was in

danger; the only affirmative response, as to staffs explanation was, "that, the Regional Director's Memorandum would allow the Region to save money; by way of transferral expenses, and to deter inmates from coming to (SHU)". Although, for the sake of saving money; the Regional Director should not be permitted to warehouse inmates, especially ones that are not placed in Administrative Detention for violating any Bureaus regulations or individuels, like that of Plaintiff; who has clear documented mental health deficits; all in the name of saving a dollar. To place an inmate, who cannot re-enter general population, due to sexual assaults of his person, in Administrative Segregation for a year; who has extensive evidence of documented Mental Health Records, that takes the form of not only quantity but quality and severity of the Inmates psychological impairments, along with the totality of the circumstances of the specific Inmate's case, mounts to nothing less than cruel and unusual punishment, coupled with a clear showing of deliberate indifference, in the first degree.

### "Relief Sought"

113). Plaintiff incorporates the allegations of paragraphs one through one-hundred-twelve, inclusive of this Complant as though the same were fully set forth herein.

114). WHEREFORE, Plaintiff, Lent Christopher Carr, II, demands judgment against Defendant(S), and respectfully request this Honorable Court, grant the below "relief" as set forth herein, as follows:

(A). Grant punitive damages, in an amount not in excess of fifty thousand ($50,000.00), dollars against each of the Defendant(S), in their individual Capacities.

(B). Grant Compensatory damages, in an amount not in excess of seven hundred fifty thousand ($750,000.00), dollars, together with interest, Cost and Litigant's fees, against Defendant, Northeast Regional Office, Federal Bureau of Prisons.

(C). Order Plaintiff, returned to a suitable general population, in his respective "Region", the Mid-Atlantic Region.

(D). Order the Northeast Regional Office, to formally "transfer" Plaintiff to the Mid-Atlantic Region, (where Plaintiff's family resides, and where his home is); in the first instance.

(E). Reinforce Bureau Policy, according to 28 C.F.R. § 541.22, and Program Statements, 5270.07 and 5100.07.

# V E R I F I C A T I O N

I, Lent C. Carr, II, Litigant/Plaintiff, being duly sworn, deposes and says that the facts, averments or deniels, set forth in the foregoing Complaint in Civil Action are true and correct to the best of his personal knowledge or information and belief; or is unsworn and subject to the penalties of law as is in order.

Lent Christopher Carr, II
USM. No. 18442-056
Schuylkill, Federal Correction
Institute
Post Office Box 759
Minersville, Pennsylvania
Zip-Code; 17954-0759

By: _L.C.Carr, II_
Lent Christopher Carr, II,
Litigant / Plaintiff

-66-

# CERTIFICATE
## OF SERVICE

Lent C. Carr, II, Litigant/Plaintiff, hereby certifies that a true and correct copy of Plaintiff's Complaint was transmitted on June 9th, 2003, by first class mail, or delivered personally to the following parties or their counsel:

Lent Christopher Carr, II,
U.S.M. No. 18442-056
Schuylkill, Federal Correction Institute
Post Office Box 759
Minersville, Pennsylvania
Zip-Code; 17954-0759

(CC): *Northeast Regional Office
*M. E. Ray
*F.C.I. Allenwood
*F.C.I. Schuylkill
*Michael Zenk
*John Nash
*Lt. Womeldorf
*Lt. Lyons
*Lt. Litchard
*Lt. Kovauch
*Mr. Stines
*Miss. D. Sweets
*Dr. Walters
*Mr. McFadden
*Federal Bureau of Prisons

BY: _____, II
Lent Christopher Carr, II,
Litigant / Plaintiff

LC/LC:

Mr. Lent Christopher Carr, II
18492-056
FCI Schuylkill
P.O. Box 759
Minersville, PA 17954

"Legal Mail"





18501

U.S. POSTAGE
MINERSVILLE, PA
JUN 10 '03
AMOUNT
$0.00
000-40895-01

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
for the
MIDDLE DISTRICT OF PENNSYLVANIA
William J. Nealon Federal Bldg. & U.S. Courthouse
235 North Washington Avenue
P.O. Box 1148
Scranton, PA 18501-1148

